IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| JAMES J. LEVENTIS d/b/a </br> Law Offices of James Leventis, </br> </br> Plaintiff, </br> </br> v. </br> </br> AT&T ADVERTISING SOLUTIONS </br> a/k/a BellSouth Advertising & Publishing </br> Corporation a/k/a AT&T Advertising </br> & Publishing, </br> </br> Defendant. | Civil Action No. 3:11-cv-03437-CMC </br> </br> OPINION AND ORDER </br> DISMISSING ACTION |

This matter is before the court on Defendant's motion to dismiss or, in the alternative, to transfer venue. The motion is founded on a venue provision in a document titled General Terms and Conditions ("Terms and Conditions"), which Defendant maintains comprised part of the contract at issue in this litigation. For the reasons set forth below, the court finds that the Terms and Conditions were part of the contract. The court further concludes that there is no impediment to enforcement of the venue provision in the Terms and Conditions and grants Defendant's motion to dismiss.

**BACKGROUND**

It is undisputed that Plaintiff entered a contract with Defendant for advertising in Defendant's "yellow pages" (paid commercial phone book listings and advertisements). That contract is the subject of the present litigation. Plaintiff alleges that Defendant violated its contractual obligations in at least two respects: (1) by failing to print all three of the advertisements for which Plaintiff contracted; and (2) by failing to print the yellow pages together with the "white pages" (listing of residential numbers). Plaintiff also alleges that publication of the yellow pages

separately from the white pages constituted a "fundamental change" in prior publishing practices which Defendant failed to disclose. Based on these allegations, Plaintiff asserts causes of action for: (1) breach of contract; (2) fraud or constructive fraud; (3) negligent misrepresentation; (4) unfair trade practices; and (5) declaratory judgment.[1] The last cause of action seeks, *inter alia*, a declaration that Plaintiff is not subject to suit in Georgia. The fraud/constructive fraud cause of action is founded on the alleged failure to disclose that the yellow and white pages would not be published together.

**Summary Order Page.** It is undisputed that Plaintiff signed a "Summary Order Page" which includes the following language:

> **IMPORTANT – READ CAREFULLY BEFORE SIGNING:** THIS CONTRACT INCLUDES AND IS SUBJECT TO THE GENERAL TERMS AND CONDITIONS AND ALL APPLICABLE SERVICE SPECIFIC TERMS AND CONDITIONS EITHER ON THE ACCOMPANYING PAGES AND ADDENDA, OBTAINED FROM OUR CUSTOMER SERVICE DEPARTMENT OR ACCESSIBLE VIA OUR WEBSITE(S), INCLUDING . . . VENUE LIMITATIONS AND LIMITATIONS ON PUBLISHER'S LIABILITY, UNLESS OTHERWISE NEGOTIATED BY THE CUSTOMER. . . . .
>
> **COPIES OF THE GENERAL TERMS & CONDITIONS CAN BE OBTAINED BY VISITING WWW.REALYP.ATT.COM OR BY CALLING OUR CUSTOMER SERVICE DEPARTMENT AT (800) 479-2977.**
>
> * * *
>
> CUSTOMER HAS REVIEWED IN DETAIL, EITHER ELECTRONICALLY OR IN PRINT, AND HEREBY APPROVES ALL OF THE MATERIALS ASSOCIATED WITH THIS CONTRACT. . . . **BY MY SIGNATURE BELOW, I WARRANT THAT I HAVE RECEIVED A COPY OF AND HAVE READ THIS ADVERTISING CONTRACT, INCLUDING ALL TERMS AND CONDITIONS AND ADDENDA, THAT I HAVE FULL AUTHORITY TO SIGN FOR AND BIND CUSTOMER AND THAT I DO HEREBY AGREE TO ALL THE TERMS HEREOF.**

---

[1] The third and fourth causes of action are mislabeled in the complaint as the fourth and fifth causes of action.

Dkt. No. 5-2 (emphasis in original). Plaintiff's signature appears immediately below this "warranty" language.

**Terms and Conditions.**  Defendant has presented uncontroverted evidence that the referenced Terms and Conditions, which the Summary Order Page indicated were available on the referenced website or by calling customer service, provided, *inter alia*, that "[a]ny action or proceeding brought by [Plaintiff] under or relating to this Agreement shall be brought in a state or federal court located in . . . DeKalb County, Georgia." Terms and Conditions ¶ 10. The Terms and Conditions also state that the advertiser (here Plaintiff) "irrevocably submits to the personal jurisdiction of and irrevocably consents to venue" in Dekalb County, Georgia. *Id.*

**Plaintiff and Colleague's Affidavits.**  In his affidavit, Plaintiff avers that he has been a licensed attorney in the active practice of law from 1988 to the present. Dkt. No. 9-1 ¶ 2. He indicates that he advertised his firm's services in the yellow pages of Defendant's predecessor, "Bell South," for approximately fifteen years before Defendant took over responsibility for selling those services. *Id.* ¶ 4. He continued advertising in the yellow pages after Defendant took responsibility at least for selling the service but began to experience difficulties at that point.  These negative experiences caused him to consider not advertising with Defendant and influenced his negotiations for advertising in the fall of 2010. *Id.* ¶ 5-10; *Id.* ¶ 11 (noting that his frustration was such that he considered "ceas[ing] using [Defendant's] phone book altogether" as there were "many alternatives to [Defendant's] Yellow Pages advertising").

Plaintiff explains that his "negotiations for the 2011 phone book occurred over the course of two or three months," ultimately leading to the contract at issue here. *Id.* ¶¶ 12-13. He asserts that, because of his prior difficulties with Defendant "there is zero chance [he] would have agreed

that any problems . . . would have to be resolved in a Georgia court pursuant to Georgia law." *Id.* ¶ 13.

>   Regarding the venue provision, Plaintiff avers as follows:
>
>   15.     . . . [The salesperson with whom I was dealing] told me he would prepare the ad order form for this agreement and *send it to me* for my signature. [He] never said anything about additional contract terms which I would have to go to a website or call an 800 telephone number to access. He never said anything about a forum selection clause or choice-of-law clause. He never said anything about general terms and conditions or multi-page, small print terms. Instead, he told me the ad copy deadline and that I would have to get a one-page, signed ad order form back to him before that deadline.
>
>   * * *
>
>   17.     *When I received* the one-page ad order form from [the salesperson], I looked to see that it included the three ads, no on-line or website promotions, and the price we had agreed upon. There was some other typewritten language, but it did not include a forum selection or choice-of-law clause, nor did the one-page ad order form indicate that such clauses were contained in some separate document(s). I signed the one-page ad order form (attached as Exhibit A) and returned it to [the salesperson] on November 29, 2010.
>
>   18.     At no time prior to signing the one-page ad form was I ever made aware of an additional five pages of Terms and Conditions which AT&T is now claiming were an integral part of my agreement. . . .

*Id.* ¶ 15, 17, 18 (emphasis added).[2]

Plaintiff does not suggest that he made any attempt to obtain the Terms and Conditions prior to signing the Summary Order Page.[3] He does, however, offer an affidavit from a colleague who

---

[2] The referenced "Exhibit A" is the Summary Order Page quoted above. *See* Dkt. No. 9-2 at 1. This document speaks for itself and plainly contradicts certain of Plaintiff's averments regarding what notice he was given of the applicability and content of the Terms and Conditions.

[3] In his opening memorandum, Plaintiff asserts that he was presented with "a one-page document purporting to memorialize the entire agreement and was asked to sign the document on the spot in order to meet a publishing deadline." Dkt. No. 9 at 9 (citing Plaintiff's affid. ¶¶ 15, 17). The referenced affidavit paragraphs (which refer to the sending and receiving of a document) do not

avers that he made an effort, roughly a year later and in response to Defendant's collection efforts, to obtain the Terms and Conditions but was unable to access them for lack of a password. Dkt. No. 9-3 at ¶¶ 26-28 (Affid. of Robert Ransom); *see also* Dkt. No. 9-1 ¶¶ 23-24 (Plaintiff's affidavit stating that, in the fall of 2011, his colleague sought but was unable to access the website "referenced in the one-page ad order form" for lack of a password); *id.* ¶ 25 (denying Plaintiff ever saw the Terms and Conditions before Defendant filed its motion to dismiss or transfer venue).

## DISCUSSION

Through the present motion, Defendant seeks specific enforcement of the venue provision (exclusive forum selection clause) found in the Terms and Conditions through dismissal or transfer of venue. "[F]orum selection clauses are prima facie valid and should be enforced when made in arms-length transactions by sophisticated businessmen, absent some compelling and countervailing reason." *Sterling Forest Assoc. v. Barnett-Range Corp.*, 840 F.2d 249, 251 (4th Cir. 1998) (citing *The Bremen v. Zapata Off-Shore Co.,* 407 U.S.1 (1972)), *abrogated by Lauro Lines S.R.L. v. Chasser*, 490 U.S. 495 (1989) (holding that venue decisions are not subject to interlocutory appeal). This rule is "applicable to domestic commercial cases," just as it is to international and maritime cases. *Id.* Moreover, *The Bremen* analysis applies "whether the forum selection clause is treated as procedural or substantive." *Id.*

In a recent decision, the Fourth Circuit concluded that enforcement of forum selection clauses should be resolved as a procedural matter. *See Albemarle Corp., v.AstraZeneca UK Ltd.*,

---

support the assertion that there was a demand for signing "on the spot." The assertion that the document purported to "memorialize the entire agreement" is, similarly, controverted by the plain language of the Summary Order Page which clearly refers to and incorporates other documents including the Terms and Conditions.

628 F.3d 643, 650 (4th Cir. 2010) (affirming dismissal of case filed in the District of South Carolina based on application of *The Bremen* factors). As the court explained, *The Bremen* and cases applying that decision

> apply federal common law favoring the enforcement of forum selection clauses when interpreting contracts that contain forum selection clauses, because forum selection clauses implicate the appropriate venue of a court. The appropriate venue of an action is a procedural matter that is governed by federal rule and statutes. . . . Thus, when a court is analyzing a forum selection clause, which changes the default venue rules applicable to the agreement, that court will apply federal law and in doing so, give effect to the parties' agreement.
>
> * * *
>
> Following the majority rule, we thus conclude that a federal court interpreting a forum selection clause must apply federal law in doing so. As an agreement purporting to modify or waive the venue of a federal court, a forum selection clause implicates what is recognized as a procedural matter governed by federal law—the proper venue of the court. Using this reasoning, the Supreme Court applied federal law in enforcing a forum selection clause in a federal suit where a motion to transfer venue under 28 U.S.C. § 1404 had been filed. . . .
>
> When construing forum selection clauses, federal courts have found dispositive the particular language of the clause and whether it authorizes another forum as an alternative to the forum of the litigation or whether it makes the designated forum exclusive.

*Id.* at 650.

While recognizing that forum selection clauses enjoy a presumption of enforceability, the court acknowledged that,

> [u]nder *The Bremen*, a forum selection clause may be found unreasonable if:
>
>> (1) [its] formation was induced by fraud or overreaching; (2) the complaining party "will for all practical purpose be deprived of his day in court" because of the grave inconvenience or unfairness of the selected forum; (3) the fundamental unfairness of the chosen law may deprive the plaintiff of a remedy; or (4) their enforcement would contravene a strong public policy of the forum state.

*Albemarle,* 628 F.3d at 651 (bracketed "[its]" in original) (quoting *Allen v. Lloyd's of London*, 94 F.3d 923, 928 (4th Cir. 1996) (summarizing *The Bremen* factors)).[4]

The Fourth Circuit's use of a bracketed "its" is of some significance as it refers back to the term "forum selection clause." This suggests that any consideration of fraudulent inducement should focus on the forum selection clause itself, not on the contract as a whole. This interpretation is consistent with *Scherk v. Alberto-Culver Co.*, 417 U.S. 506 (1974), in which the Court held as follows:

> In *The Bremen* we noted that forum-selection clauses "should be given full effect" when "a freely negotiated private international agreement (is) unaffected by fraud . . . ." This qualification does not mean that any time a dispute arising out of a transaction is based upon an allegation of fraud, as in this case, the clause is unenforceable. Rather, it means that an arbitration or forum-selection clause in a contract is not enforceable *if the inclusion of that clause in the contract* was the product of fraud or coercion.

*Scherk*, 417 U.S. at 519 n. 14 (emphasis added).

Plaintiff's arguments focus on the first through third factors. While Plaintiff does not expressly rely on the fourth factor, his substantial reliance on *Johnson v. Key Equip. Finance,* 627 S.E.2d 740 (S.C. 2006), which declined to enforce a forum selection clause in the face of a claim that the contract itself was procured by fraud, suggests a public policy argument. *See* Dkt. No. 9 at 8 (relying on *Johnson*); Dkt. No. 16 at 3 (relying on *Johnson* in sur-reply).[5] The court, therefore, addresses all four factors as they may relate to this action.

---

[4] In *Allen*, the Fourth Circuit uses "their" rather than the singular "its" to refer to "choice of forum and law provisions[.]" This usage is left intact in *Albemarle'*s quotation of the fourth factor in *Allen* as reflected above.

[5] Plaintiff's only express reference to public policy is better cast as an argument of inconvenience under the second factor: "There is nothing convenient or fair about transferring this case to Georgia. Accordingly, there is a strong public policy reason for keeping this case in the state of South Carolina." Dkt. No. 9 at 12.

**First Factor.** Plaintiff raises three distinct arguments against enforcement which arguably arise under *The Bremen*'s first factor. These include arguments that the Terms and Conditions which include the forum selection clause were (1) not disclosed, (2) difficult to obtain, and (3) hard to read. For present purposes, the court will assume without deciding that all three of these factors may be considered as evidence that "formation [of the venue agreement] was induced by fraud or overreaching," such that it might support non-enforcement under the first *The Bremen* factor *if the difficulties are so extreme as to support a finding of fraud or overreaching*. The facts do not, however, support such a conclusion for reasons discussed below.[6]

**Nondisclosure.** As noted above, Plaintiff concedes that he signed the Summary Order Page. That one-page document includes the following statement: "**BY MY SIGNATURE BELOW, I WARRANT THAT I HAVE RECEIVED A COPY OF AND HAVE READ THIS ADVERTISING CONTRACT, INCLUDING ALL TERMS AND CONDITIONS AND ADDENDA**." Dkt. No. 9-2 at 1 (emphasis in original). The same document stated that "**COPIES OF THE GENERAL TERMS & CONDITIONS CAN BE OBTAINED BY VISITING WWW.REALYP.ATT.COM OR BY CALLING OUR CUSTOMER SERVICE DEPARTMENT AT (800) 479-2977.**" *Id.* It also warned that the "CONTRACT INCLUDES AND IS SUBJECT TO THE GENERAL TERMS AND CONDITIONS" which could be obtained from the website or customer service department, and that the Terms and Conditions included "VENUE LIMITATIONS."

---

[6] Plaintiff does not argue that this was a contract of adhesion. Such an argument would, in any event, be precluded by his averments regarding the lengthy negotiation period and the availability of other means of advertising.

In light of this language, found in the single-page document which Plaintiff concedes he signed, Plaintiff cannot reasonably argue that he was unaware that the contract incorporated terms found in one or more other documents. Neither can he reasonably deny that he was on notice that one of those terms related to a venue limitation or forum selection clause. Any claim that the forum selection clause was procured by fraud, therefore, fails.[7]

**Difficulty Obtaining Terms and Conditions.** In addition to arguing that the venue limitation was not disclosed, Plaintiff suggests it should not be enforced because the Terms and Conditions were difficult to obtain. Plaintiff does not, however, suggest that he actually made any effort to obtain the Terms and Conditions before he signed a warranty stating that he had both received and read the document. Thus, any difficulty which he *might* have encountered had he attempted to obtain the document before signing the Summary Order Page is merely speculative and fails to establish that some difficulty for which Defendant is responsible prevented Plaintiff from receiving and reading the Terms and Conditions before he signed the Summary Order Page.[8]

---

[7] As noted above, the first *The Bremen* factor looks to whether the forum selection clause was procured by fraud, not whether there is some allegation of fraud relating to the contract as a whole. *See Scherk,* 417 U.S. at 519 n. 14. Plaintiff's substantive fraud and misrepresentation claims relate to Defendant's failure to disclose that, for the first time, the yellow pages would not be printed together with the white pages. Nothing in these allegations suggests that the venue provision itself was procured by fraud or overreaching.

[8] For these purposes, the court will assume without deciding that Plaintiff would have experienced the same difficulty if he had attempted to obtain a copy of the Terms and Conditions online in the fall of 2010 (when he signed the contract). Even with these assumptions, it is doubtful Plaintiff's "evidence" supports a finding of non-availability given the absence of evidence of any further inquiry such as a call to the toll free number. *See generally Security Credit Leasing, Inc. v. Armaly*, 529 S.E.2d 283, 286 (S.C. App. 2000) (enforcing forum selection clause in lease despite plaintiff's claim that he was unaware of the clause where plaintiff "had an opportunity to read the lease agreement and discover its contents, and is charged with notice of the content of the contract he signed.").

It is also significant that Plaintiff is an attorney with many years experience. As an attorney, he qualifies as a sophisticated business person, particularly respecting the import of "venue limitations" and the significance of signing a warranty that he had read specified documents. *See Sterling Forest*, 840 F.2d at 251 (noting, in referring to attorneys who negotiated contract for Plaintiff, that "[a]s experienced lawyers, they knew that the word 'venue' means 'place of suit'").

Collectively, Plaintiff's profession, years of experience, concession that he signed the Summary Order Page, and plain language in that one-page document establish that Plaintiff was placed on notice that (1) there were Terms and Conditions which were incorporated into the contract, (2) these Terms and Conditions included venue limitations, and (3) it was his responsibility to obtain and read the Terms and Conditions (for which multiple sources were provided) before signing the Summary Order Page. Any averment to the contrary is irrefutably contradicted by the plain language of the document Plaintiff admits signing.

**Difficulty Reading Terms and Conditions.** The court reaches essentially the same conclusion as to the format of the Terms and Conditions and for the same reasons. The court agrees that the formatting of the Terms and Conditions makes them difficult to read and the use of a "Miscellaneous" heading makes it somewhat difficult to locate the venue provision.[9] There is,

---

[9] The Terms and Conditions are anything but a model of good formatting. The relevant terms are contained within a five-page, single-spaced, small-print document which is made all the more difficult to read by virtue of its single-column formatting (a single line contains 30 to 36 words). Moreover, the venue provision appears under the generic heading "Miscellaneous." While these factors make the document difficult to read and the venue provision somewhat difficult to find, they do not support a finding of fraud or overreaching, at least absent evidence that a party was actually misled. No such showing may be made here given that Plaintiff does not claim to have obtained or read the document. Moreover, while a lay person might have found the document hard to understand, the court is not persuaded that a trained lawyer would have been misled by the content or format of the document had he undertaken a reasonable review of it.

however, no evidence that these potential difficulties had any causative effect on Plaintiff's alleged failure to receive notice of the venue limitation for the simple reason that Plaintiff never attempted to obtain and read the Terms and Conditions despite warranting that he had done so. Moreover, as noted above, the document Plaintiff admitted he signed gave clear notice that the Terms and Conditions included venue limitations. While the Summary Order Page may not have revealed what the limitations were, they clearly placed Plaintiff on notice that limitations existed.[10] By warranting that he had read the Terms and Conditions in the face of this warning, Plaintiff assumed the risk that the venue limitations would not be to his liking.

In sum, the Summary Order Page which Plaintiff admits signing gave notice that he was not only agreeing to a venue limitation located in the Terms and Conditions but also warranted that he had read the Terms and Conditions. Under these circumstances, the court finds that the venue limitations were not procured by fraud or overreaching.

**Second and Third Factors.** The second and third *The Bremen* factors also fail to support Plaintiff's position. The selected forum is a state which borders Plaintiff's home state and preferred forum. While this may present some inconvenience, it does not present a "grave inconvenience or unfairness." This is particularly true in the context of this action as it is, by Plaintiff's own admission, a preemptive action brought in response to a threatened collection action which would be brought in Georgia. *See* Dkt. No. 9 at 3 (conceding this action was in response to Defendant's

---

[10] In light of the plain language of the Summary Order Page, which Plaintiff admits he signed, Plaintiff's averment that the document gave no notice of the existence of a forum selection clause cannot be credited. *See* Plaintiff affid. ¶ 17 (stating that the "the one-page ad order form [did not] indicate that such clauses were contained in some separate document").

threat to file suit in Georgia); Affid. of Robert Ransom ¶¶ 23-29. If Defendant ultimately decides to file such an action, Plaintiff will be free to assert his current claims as counterclaims.

Plaintiff has, moreover, failed to make any showing that the law to be applied in the designated forum, the State of Georgia, would "deprive [him] of a remedy." Thus, he fails to show any fundamental unfairness in the application of Georgia law.[11]

**Fourth Factor.** The fourth *The Bremen* factor considers whether enforcement of the forum selection clause would contravene a strong public policy of the forum state. *See generally The Bremen*, 407 U.S. at 15 ("A contractual choice-of-forum clause should be held unenforceable if enforcement would contravene a strong public policy of the forum in which suit is brought, whether declared by statute or by judicial decision."). Whether South Carolina has a strong public policy against enforcement of forum selection clauses is a subject on which judges in this district have reached differing conclusions. *See, e.g., T.R. Helicopters, LLC, v. Bell Helicopter Textron, Inc.*, C.A. No. 3:10-2250-JFA, 2010 WL 4781158 (D.S.C. 2010) (noting that two district judges had held that South Carolina had a strong public policy against enforcement of forum selection clauses but declining to follow that lead in the absence of "clear guidance" from the state courts or legislature); *Consolidated Insured Benefits, Inc., v. Conseco Medical Ins. Co.*, C.A. No. 6:03-3211-RBH, 2006 WL 2864425 (D.S.C. 2006) (addressing split of authority within the district). That debate was, however, resolved by the Fourth Circuit in December 2010 through its decision in *Albemarle* (discussed *supra* at 5-6). In *Albemarle*, the court rejected an argument that *The Bremen*'s fourth factor precluded enforcement of a forum selection clause in an action filed in the District of South

---

[11] The "Miscellaneous Terms" of the Terms and Conditions includes a provision stating that the "Agreement will be governed by and construed in accordance with the terms of the forum chosen[.]" Dkt. No. 5-2 at 11.

Carolina. *Albemarle*, 628 F.3d at 651-52 (rejecting public policy argument on four grounds including that there was no evidence either in South Carolina's case law or statutory provisions of a strong public policy against enforcement of forum selection clauses). In light of *Albemarle*, Plaintiff cannot argue that South Carolina has a sufficiently strong public policy against enforcement of forum selection clauses to preclude enforcement of the forum selection clause at issue in this action.[12]

## CONCLUSION

For the reasons set forth above, the court finds the venue limitations found in the Terms and Conditions were available to Plaintiff prior to execution of the contract, were drawn to his attention by virtue of express language in the Summary Order Page, and are enforceable in light of the *The Bremen* factors. Defendant's motion to dismiss is, therefore, granted.

IT IS SO ORDERED.

                                                s/ Cameron McGowan Currie
                                                CAMERON MCGOWAN CURRIE
                                                UNITED STATES DISTRICT JUDGE

Columbia, South Carolina
March 19, 2012

---

[12] Indeed, three of the four reasons given for the holding in *Albemarle* suggest that no expression of the state's public policy would be sufficient. *See Albemarle*, 628 F.3d at 652 ("*First*, insofar as the South Carolina statute would purport to impose South Carolina procedural rules on a federal court, it would be preempted by federal law."); *id.* ("*Second*, state reluctance to recognize and enforce forum selection clauses was specifically addressed and countered by the Supreme Court's holding in *The Bremen*" which "held that, contrary to judicial disfavor of forum selection clauses such as that manifested in the South Carolina statute, in federal court, forum selection clauses enjoy a presumption of enforceability"); *id.* ("*Fourth* and finally, it can hardly be a strong public policy to countermand the very policy that the Supreme Court adopted in *The Bremen*.").